No. 2950.

## WILLIS RIDER v. THE STATE.

1. SELF DEFENSE—CONFLICT OF EVIDENCE—CHARGE OF THE COURT.— The trial being for an assault with intent to murder, and the proof conflicting as to whether the accused inflicted the injury, the trial court charged the jury, by request, as follows: "If you have a reasonable doubt as to whether the defendant was the person who shot Matt Webb, you should acquit him. If you are satisfied beyond a reasonable doubt that defendant was the person who shot Matt Webb, and have a reasonable doubt as to whether, at the time of shooting Matt Webb, defendant had a specific intent to kill said Matt Webb, or that he was acting in the defense of Anderson Rider, under the law of self defense as given in the main charge, you will find defendant not guilty." *Held*, that the charge was correct, as responsive to the proof in the case.

2. SAME—ALIBI.—The trial court is not required to charge upon the defense of alibi, unless it is the sole defense interposed by the accused; or unless, there being other defenses, the accused requests an instruction upon such defense; and, in such case, the omission to give such a charge will be revised by this court only when the charge has been specially excepted to because of such omission.

3. SAME—AGGRAVATED ASSAULT.—See the statement of the case for evidence *held* not to raise the question of aggravated assault, and therefore not to have called for a charge upon that grade of assault.

4. SAME—PRACTICE—IMPEACHING TESTIMONY.—It is only when a witness has been properly impeached as to his truth and veracity that it is proper for the court to instruct the jury with reference thereto; and, as bad character for truth, to be a disqualifying fact, must be notorious in the neighborhood of the witness's residence, it should be proved by more than one discrediting witness—a single discrediting witness being neither sufficient nor satisfactory.

5. SAME—NEW TRIAL—MISCONDUCT OF THE JURY.—The drinking of intoxicating liquor by a juror while deliberating upon the verdict, unless by such drinking he become so intoxicated as to render it probable that his verdict was influenced thereby, is not ground for new trial.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The conviction in this case was for an assault with intent to murder Matt Webb, and the penalty assessed was a term of two years in the penitentiary.

Matt Webb was the first witness for the State. He testified that, on the night of February 3, 1887, the defendant and many

other persons attended a party at the house of Jesse Webb, the brother of the witness, which said house was situated in Smith county, Texas. The said house of Jesse Webb stood on the north side of the road and faced south, the said road extending east and west. The yard fence which paralleled the road was between fifteen and twenty feet from the front gallery of the house. The said road and the said fence were about ten feet apart. The yard gate in the fence was immediately in front of the south door of the house. Between nine and ten o'clock on that night, while the witness and Cato Bozier were in a side room taking a drink of whisky, the witness heard loud cursing by some party or parties on the outside and north of the house. The cursing indicating an angry altercation which might terminate in a row, the witness walked through the house and started to the point from which, according to the sound of the voices, the witness thought the curses were being uttered. Just as he left the gallery to go to the point north of the house he met the defendant and another party whom he could not now remember. Witness asked the parties what was the matter out there. Defendant replied: "By God, there is nothing the matter with me." Witness then told defendant that he did not want a row at the house. Defendant replied that witness could not stop it. Witness replied that, as he (witness) was the best man on the ground, he could stop it. Defendant said: "By God! you are not as good a man as me." By this time the parties had reached a point near the front gate. Without another word being spoken, the defendant struck at the witness with a knife and cut the lappel of his coat. About the same time Anderson Rider, the brother of the defendant, seized the witness, and the witness, in his efforts to release himself from the grasp of Anderson Rider, backed out of the front gate and down the road for a distance. When he got clear of Anderson Rider he took his position in the middle of the road and while he was standing there the defendant, who was standing on the south side of the road, and about fifteen feet west from the gate, shot the witness, the ball taking effect in the rear of the right side. Witness fell on receiving the ball, and was presently carried into the house, where he remained two weeks before he was recovered enough to be taken to his home. The defendant removed the witness's shoes for him after he was taken into the house and placed on a pallet, and remained at the house during a part of the night at least. Witness could not state how long

defendant stayed at the house after shooting witness. The witness stated that he knew perfectly well that he was shot by the defendant, and denied that, while confined at his brother's house, he told Becky Minor that he did not know who shot him. He denied that, about a week after the shooting, he said to Willis Calloway: "I did not know that I was shot until somebody touched me on the shoulder, because I was fighting like a fool."

Jesse Webb, the brother of the prosecuting witness, testified for the State, that he was inside of his house when the difficulty between his brother Matt and the Riders began. When he got to the gate he found the defendant and Matt Webb quarreling. Presently Anderson Rider seized Matt, and the two in their struggles backed out of the gate and down the road. During this struggle between Matt and Anderson Rider, John Rider, another brother of the defendant, drew a pistol, and manifested a purpose to use it. Witness seized the pistol in John Rider's hand, and tried to get possession of it. About that time defendant came out of the gate, and walked west to a point near Matt and his brother Anderson, presented a pistol, fired and shot Matt in the side. Matt fell to the ground upon being shot, and was taken into witness's house and placed on a pallet. Defendant went into the house after the shooting, but remained only a short while. Matt was at the witness's house over a week before he was well enough to be taken to his own home. Within a few minutes after the shot was fired the witness went to Mr. Florey's house to borrow a horse to go after a doctor, but he did not tell Mr. Florey, while there, that he did not know who shot Matt. Matt had just released himself from Anderson Rider, and was standing between the road and the front fence when he was shot. The defendant fired the shot from the road. Witness was standing about fifteen feet distant from the defendant when he fired. There was no moon that night, but it was bright star light.

Berry Curry testified, for the State, that he attended the dance at Jesse Webb's house on the night that Matt Webb was shot, and witnessed the shooting. Matt Webb left the house to put a stop to a quarrel that appeared to be in progress at a point north of the house. A few minutes later the witness went out of the house and found Matt Webb and the defendant near the front gate, engaged in a quarrel. He saw the defendant strike at Matt Webb with a knife. Anderson Rider then seized

Matt Webb, and they struggled out of the gate westwardly down the road. Anderson appeared to be trying to hold Matt, and Matt appeared to be trying to release himself. Finally Matt seized a board from a pile of lumber and struck Anderson two or three blows over the head with it. Anderson staggered under each blow, but did not fall. Finally Matt got loose from Anderson, and was striking him when the defendant ran out of the gate, and around witness, and from a point within two feet of witness, fired upon Matt with a pistol, the ball taking effect in Matt's side. When shot, Matt was west of the gate and on the north side of the road. Defendant was west of the gate and on the south edge of the road. Witness saw Jesse Webb and John Rider east of the gate, struggling with each other, while Anderson Rider and Matt Webb were scuffling west of the gate. Jesse Webb appeared to be trying to take something away from John Rider. The witness denied that he ever at any time or place, told Willis Calloway that he did not know who shot Matt Webb, and that he was willing to swear that Willis Rider was not the man who did it.

The State closed.

Anderson Rider, the brother of the defendant, was the first witness introduced in his behalf. He testified that he and the defendant and their brother John went together to the party at Jesse Webb's house on the night that Matt Webb was shot. Defendant did not take a pistol to the party that night. The witness was absolutely certain of this last mentioned fact. He knew that fact to be true, because he had occasion to search the defendant's person just before reaching Jesse Webb's house. That search came up in this way: Defendant dunned the witness for twenty-five cents that witness was owing him. Witness told him that he had but twenty-five cents, and had use for that. Defendant complained that he had no money at all. Witness then proposed to search defendant, agreeing, if he found no money on his person, to pay him the only twenty-five cents he had. Defendant assented, and witness searched his person carefully, without finding a pistol. He was satisfied that if defendant had had a pistol on his person he would have discovered it in his search for money. Just before the quarrel came up on that night the witness and John Rowe were on the north side of the house. Rowe pushed against the north door, so that the said door struck Matt Webb and angered him. Matt

then went out of the house to the west end of the gallery, where he met the defendant. He asked the defendant what was the matter. Defendant replied: "Nothing is the matter with me." Matt then said: "By God, I don't want any fuss here," and presently added: "I am the best man on the ground." The defendant replied: "You are no better man than I am." Matt then proceeded to curse defendant, who attempted to pacify him. Witness then stepped up to Matt and said to him: "Come on, Matt. Don't let's have any fuss here," and led him to a point near the gate. Matt then jerked loose from witness and ran through the gate to a pile of lumber and seized a board. Witness followed him down the road to a point near the lumber pile, when Matt, using the board, knocked witness down three different times. While Matt was striking witness the shot was fired, witness did not know by whom. When the shot was fired the witness was standing between Matt and the fence, Matt being then standing on the north edge of the road and facing the witness. After the shot was fired the witness saw the defendant approaching from the direction of the gate. Defendant did not pass out of the gate when the witness and Matt did. Witness did not know where John Rider was when the shot was fired. John Rider was present when witness searched the defendant for money.

Cato Brozier testified, for the defense, that a short while before the shooting he and Matt Webb went into the north room to take a drink. While the witness was drinking, somebody pushed the door against him, which appeared to anger Matt, and he went out of the house to see about it. Witness did not go out with Matt, but went out a few minutes later. When he got out of the house he found the defendant standing at the west end of the gallery. Witness stood there talking to the defendant for a few minutes, and, just as he turned to go back into the house, the shot was fired. Witness, not wishing to see anything of the row, went home, but came back a couple of hours later.

John Rowe testified, for the defense, that before the shot was fired he went out of the house, passed defendant at the west end of the gallery, and went to the road where Matt Webb and Anderson Rider were. When the pistol fired he walked back to the house, passing defendant in the yard, going towards the gate. Witness was out of the house ten or fifteen minutes. He did not know who shot Matt Webb.

Becky Minor testified that she was in Jesse Webb's house when Matt Webb was shot. She heard but did not see the shooting. Matt Webb remained at Jesse's house over a week before he was taken home, and witness remained there and waited on him. On the seventh day after the shooting Matt asked witness: "Becky, do you know who shot me?" Witness replied: "No, Matt, do you?" He replied: "No, but I suppose Willis Rider did, as I was knocking his brother to his knees every time I hit him." Nobody else was present when this conversation took place between witness and Matt Webb.

Willis Calloway testified, for the defense, that a few days after the shooting he, in company with defendant and his brother Anderson, met Berry Curry on the road, and asked him if he knew who shot Matt Webb. Curry replied that he did not know, but would "swear and be d—d that Willis Rider did not do it." Near the same time the witness had a conversation with Matt Webb, in the course of which Matt said that the defendant shot him, but that he, Matt, was fighting like a fool at the time, and did not know that he was shot until somebody touched him on the shoulder. Witness was friendly to all of the parties, and his reason for interesting himself in the matter was to keep down a prosecution.

E. B. S. Florey testified, for the defense, that Jesse Webb came to his house to borrow a mule to go after a doctor shortly after Matt was shot. He then told witness that he did not know who shot Matt. Witness knew that Berry Curry's reputation for truth and veracity was bad, and from that reputation he did not think him entitled to belief on oath. The reputation of John and Anderson Rider for truth and veracity the witness knew to be good. He was on the defendant's bond.

John Rider testified, for the defense, that he saw Anderson Rider search the defendant for money just before they reached Webb's house, and he knew that, if defendant had had a pistol at that time, that search would have discovered it. At the time the pistol fired, the witness and Jesse Webb were east of the gate, struggling over a pistol which Jesse was trying to take from witness. Just after the shooting, the witness saw the defendant walk out of the gate and down the road to where Matt Webb was. At this point the witness was asked by the State if he shot Matt Webb. The court advised the witness that he need not answer the question if he did not want to, and he declined to answer.

*White & Edwards,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

White, Presiding Judge.    There was a conflict between the witnesses for the State and the defendant—the State's witnesses swearing positively that defendant shot Matt Webb, and the defendant's witnesses placing him, at the time of the shooting and immediately after it, in such a situation as to render it impossible he could have done it.

A special instruction requested by defendant, and given by the court, presented the law applicable to this question, as follows, viz: "If you have a reasonable doubt as to whether the defendant was the person who shot Matt Webb, you should acquit him.    If you are satisfied beyond a reasonable doubt that the defendant was the person who shot Matt Webb, and have a reasonable doubt as to whether, at the time of shooting Matt Webb, defendant had a specific intent to kill said Matt Webb, or that he was acting in the defense of Anderson Rider, under the law of self defense as given in the main charge, you will find the defendant not guilty."    This instruction, together with the main charge, presented all the law fairly and legitimately arising upon the facts in the case.

It will be seen that the defenses were: 1. That defendant did not do the shooting; and, 2, that, if he did, he shot in defense of his brother.    If an alibi had been the *only* defense, then, perhaps, the court should have charged specifically with reference to it.    Where it is not the sole defense, it is not necessary that the court should charge specially upon it, unless requested to do so (Ayres v. The State, 21 Texas Ct. App., 399), and the omission in the charge upon the subject in such a case will not be error, unless the charge is specifically excepted to upon that ground.    (Willson's Crim. Stats., sec. 1069.)

In our opinion there was no phase of the facts presenting a case of aggravated assault.    Appellant assaulted the injured party with a knife, and his brother immediately seizes upon the injured party also, and engages in a desperate struggle with him, in which Webb seizes a board and strikes the brother.    Appellant runs around the struggling men until he gets an opportunity and shoots Webb, the fight having been a continuous one.    There is no self defense, or even a justifiable self defense of his brother, in this; and certainly there would have

been no manslaughter had death ensued, because appellant provoked the contest with the apparent intention of killing, or doing serious bodily injury at least. (Penal Code, art. 603.)

There was no such impeachment of the witness as required of the court an instruction upon that matter. If such charge is required it is only in those cases where the witness has been properly impeached as to his truth and veracity. (Henderson v. The State, 1 Texas Ct. App., 432.) There was but one of the State's witnesses thus attempted to be impeached, and he was attempted to be impeached by one single witness only, which is not sufficient nor satisfactory for such a purpose. (Wofford v. The State, 44 Texas, 439; Butler v. The State, 3 Texas Ct. App., 48.)

There was no evidence that, during the trial or after retiring, the foreman of the jury became so intoxicated as to render it probable his verdict was influenced thereby. Such proof is necessary in order to entitle a defendant to a new trial for misconduct of this character. "Mere drinking of liquor by a juror is not sufficient ground for granting a new trial." (Code Crim. Proc., art. 777, sub. div. 7; Willson's Crim. Stats., secs. 2374, 2545; Allen v. The State, 17 Texas Ct. App., 637.)

We have found no error in this record for which the judgment should be reversed, and it is affirmed.

*Affirmed.*

Opinion delivered October 31. 1888.